**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

November 24, 2026

**VIA ECF**

The Honorable Valerie E. Caproni
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

**Re: *United States v. Henry Paul Regan*, S1 25 Cr. 183 (VEC)**

Dear Judge Caproni:

The defendant, Henry Paul Regan, stole tens of millions of dollars from hundreds of retail investors, many of them retirees, by falsely promising them a safe way to grow their savings. Instead, he diverted the money for his own purposes, leaving behind a wake of financial devastation. Hardworking people trusted Regan with all, or much, of their retirement money. Now they are left hoping that they will be able to recover even a portion of those savings. Because of the severity of Regan's crime, his history of wrongdoing, and his apparent reluctance to make amends, the Government respectfully submits that the Court should impose the statutory-maximum term of 15 years' imprisonment, which is within the stipulated sentencing range under the United States Sentencing Guidelines.

## I. Background

### A. Offense Conduct

Between 2022 and 2024, Regan defrauded hundreds of retail investors by offering products through two entities called Next Level Holdings ("Next Level") and Yield Wealth Ltd. ("Yield".) Regan preyed on people looking to save for retirement, falsely claiming that his investment products were safe because they were fully insured, were compatible with investing through Individual Retirement Accounts ("IRAs"), and would offer a high, guaranteed return. Through those lies, Regan fraudulently induced over 300 people to invest more than $60 million in Next Level and Yield investment products, and his criminal scheme has left those investors with over $50 million of losses. (*See* Presentence Investigation Report ("PSR") ¶ 8.)

Regan's fraud began by marketing investments in a company he called Next Level. Regan described Next Level as a company that provided money and support to mining companies in Colombia, in exchange for receiving precious metals at discount rates. Regan recruited a network of people who typically sold annuities—which are safe, fixed-income investments often sold to people nearing retirement—and had them sell a product he called "Next Level Holdings Principal & Interest Protected Notes" ("Next Level Notes".) Regan prepared marketing materials and talking

points for Next Level Notes that touted two key features: Next Level Notes supposedly promised high returns from precious-metal trading and were purportedly a safe investment because both interest and principal repayments were fully insured. (PSR ¶¶ 10-11.)

The investment presentation for Next Level Notes shows how Regan's scheme worked. The presentation positioned Next Level as a sophisticated firm that "specializ[ed] in extracting value from the responsible precious metals supply chain, while delivering investors double-digit yields with full insurance protection." The presentation also portrayed Next Level as having a track record of success, having "successfully developed a corridor to export precious metals between Colombia and Europe and the U.S," with seven years of experience. Excerpts from the relevant slides are below:




Independent investment firm, specializing in extracting value from the responsible precious metals supply chain, while delivering investors double-digit yields with full insurance protection.




Regan spun a narrative that this successful operation allowed Next Level to offer investors "[s]table and uncorrelated returns through trade finance, precious-metals backed and fully

guaranteed investment opportunities with insurance policies protecting investor yield(s) and helping small, responsible mines export or increase their production." He offered Next Level Notes with terms of three, five, seven, or ten years, each of which had interest rates ranging from 12% to 15%, and he promised that each Note would be a "Fully Guaranteed Investment," complete with "a dedicated insurance policy issued directly to our note holders from top AM Best-rated insurers," so investors "cannot lose their principal" and have "a guarantee that they will receive the interest offered in our enhanced annuity note offering in full." Relevant excerpts are below:




**FULLY GUARANTEED INVESTMENT** – Our Fully Secured Principal & Interest Fixed Rate Note™ Enhanced Annuity Offering provides each note holder with a financial guarantee bond, similar to a standard surety bond, with a dedicated insurance policy issued directly to our note holders from top AM Best-rated insurers guarantee our note holders cannot lose their principal investment and also serve as a guarantee that they will receive the interest offered in our enhanced annuity note offering in full.

Finally, Regan made sure that the documents investors signed reinforced the claims in the investor presentation. Each investor received a Next Level Note that was labeled "Fully Insured Secured Promissory Note Principal and Interest Protected." Each investor also received a document called a "Surety Bond Contract," and a "Reinsurance Cover Note," which were supposedly documents issued by two insurance companies, ensuring that the investor would receive all of the promised interest payments and the return of their principal. (*See* PSR ¶¶ 13-14.) Regan also made sure that his Next Level Notes were as attractive as possible to investors by working with a company that allowed investors to purchase the Notes into IRAs.

The pitch for Next Level Notes was a lie. While Regan had made some mining-related investments, there was no successful trade-finance operation. There were no profits from selling precious metals. And there was no history of selling precious metals from Colombia to Europe or the United States. Regan also lied about the insurance protections. Aside from one year of coverage on the first $7.75 million of Next Level Notes, Regan had nothing protecting investors' principal,

much less guaranteeing interest payments. The surety bonds and reinsurance letters supposedly protecting investors were fake. (*See* PSR ¶¶ 21-24.)

Regan's lies exposed large numbers of investors to devastating losses. Between 2022 and 2024, Regan used a network of salespeople to sell approximately 300 Next Level Notes to investors across the country. Those investors sent more than $45 million to Regan's businesses on the false belief that he would keep their money safe and help them grow their savings. (PSR ¶ 15.)

The fraud did not stop with Next Level. In early 2024, Regan launched a new business called Yield, which he advertised as an alternative to traditional banks that could offer investors higher returns on their savings and greater protections. Regan employed a similar playbook to the one he used for Next Level. He began by recruiting independent salespeople to sell "Mega High Yield Term Deposits" and "Super High Yield Term Deposits" (collectively, the "Yield Term Deposits".) Regan armed those salespeople with marketing materials and talking points, designed to make it seem like investors would receive high returns and that both the principal and interest on their investments would be fully guaranteed. (*See* PSR ¶¶ 16-18.)

Once again, the marketing materials that Regan used demonstrate how he committed the fraud. Regan developed a slick presentation that advertised Yield as "revolutionizing the banking industry with Enhanced Term Deposits, offering yields up to 10.5% APY and security through insurance coverage up to $10 million," which "positions Yield as the top choice for investors prioritizing both high returns and safety." The marketing materials went on to state that Yield Term Deposits gave investors "access to a diverse portfolio that spans multiple industries, including the lucrative sectors of mining and rare minerals," which "allows you to benefit from a broad spectrum of assets, optimizing your investment for both stability and significant returns." Regan separately represented to investors and salespeople that one of those diversified assets would be investments in plans related to the Affordable Care Act. (*See* PSR ¶ 19.) Examples of relevant parts of the investment deck are below:






Regan also, through the investment presentations, portrayed Yield Term Deposits as safe, fully insured investments. Again comparing Yield Term Deposits favorably to money in the bank, his presentations stated: "Leave behind the finite and outdated 250k offered by the FDIC and obtain a total coverage of 10mm given to our . . . depositors. Backed by several AM Best investment-grade rated insurance companies[,] . . . providing our depositors the ultimate in insurance protection for both the principal and interest APY offered in the [Yield Term Deposits]." Further excerpts from the investor presentations are below:






Once again, Regan's investment pitch was based on a lie. Yield did not generate returns from a diversified set of investments or make meaningful investments related to Affordable Care Act plans. Regan also did not purchase or maintain insurance for Yield Term Deposits, leaving investors fully exposed to losses from his wrongdoing. And once again, Regan's fraud was successful: Over the course of 2024, Regan and his salespeople sold approximately 85 Yield Term Deposits, taking in over $15 million from investors. (*See* PSR ¶¶ 20-24.)

For a time, Regan was able to sustain his fraud by running Next Level and Yield like a Ponzi scheme. Rather than paying interest and principal to investors by using profits from real investments, Regan used money from new investors to make payments to old ones. He also used investor money to pay commissions to salespeople, fund his lifestyle in Colombia, make payments to his ex-wife, buy real estate, and make loans to or investments in entities that were outside the scope of how he promised to use investor funds. (*See* PSR ¶ 22.)

This set the conditions for Regan's scheme to crumble quickly. On August 30, 2024, a news outlet published an article about Yield and Regan, expressing skepticism. Regan responded by holding a videoconference with salespeople, in which he claimed that the article was false and misleading. But once word of Regan's scheme was out, new sales began to dry up and investors began clamoring for their money back. That pressure forced Regan to close Next Level and Yield in November 2024. While Regan had returned some money to select investors before that closure, the vast majority lost everything: Investors had over $50 million of lost principal outstanding, and because Next Level and Yield did not purchase or maintain insurance, investors have not been able to recover those losses. (*See* PSR ¶¶ 25-26.)

**B. Arrest and Procedural History**

On April 22, 2025, a grand jury in the Southern District of New York returned a four-count Indictment, charging Regan with conspiring to commit wire fraud and securities fraud, substantive wire fraud and securities fraud, and aggravated identity theft. Regan was in Colombia at the time he was charged, and in early September 2025 he was arrested trying to cross the border into Ecuador using fraudulent travel documents. Regan was promptly expelled to the United States and taken into federal custody upon his arrival in the Southern District of Florida on September 4, 2025. Regan was ordered detained and has remained in custody.

On March 13, 2026, Regan pled guilty to a Superseding Information, charging him in three Counts: Count One charges him with offering fraud in connection with his sale of Next Level Notes; Count Two charges him with offering fraud in connection with his sale of Yield Term Deposits; and Count Three charges him with conspiring to commit those crimes. Pursuant to Regan's plea agreement, the parties stipulated that Regan's offense level is 35, and that he is in Criminal History Category I, resulting in an applicable Guidelines range of 168 to 180 months' imprisonment. That Guidelines range would have been higher, but-for the statutory maximum term of 180-months' imprisonment. Regan also agreed that he owes forfeiture of over $63 million and restitution of over $56 million. (*See* PSR ¶ 5.) The Probation Office calculated Regan's Guidelines range in light of the revised version of the Guidelines, which also resulted in an applicable sentencing range of 168 to 180 months' imprisonment (the "Applicable Guidelines Range".)

## II. Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005.) Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a.)

## III. Discussion

The Government respectfully submits that the Court should impose a sentence of 15 years' imprisonment, which is at the top of the Applicable Guidelines Range. That sentence is necessary to reflect the severity of Regan's crime, his history of wrongdoing, and his failure to take steps to return funds to investors.

### A. The Presentence Report Accurately Reflects the Severity of Regan's Crime.

In objections to the Presentence Report, Regan attempted to downplay the significance of his crime by resisting characterization of his crime as a "Ponzi scheme" and noting that he used investor money to make some investments in mining operations. His arguments fall flat. "According to the [SEC], [a] Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors." *In re Bernard L. Madoff Inv. Secs. LLC*, 976 F.3d 184 (2d Cir. 2020.) That is exactly what Regan did: He took investor money on false pretenses and made it appear that he was earning profits by using money from new investors to pay back old ones. Even assuming, *arguendo*, that Regan put some investor money to "real" investments, including in mining, that does not help his cause. Regan's pitch to investors was that he could generate profits from those investments, which would allow him to pay interest and buy insurance. That was a lie. Whatever investments Regan made did not generate

profits—let alone enough to pay interest and buy insurance—which is why Regan resorted to a Ponzi scheme to keep his fraud going.

Regan's characterization, through his objections, of how he used investor funds also improperly downplays the significance of his crime. Start with the money sent to Grupo Inversur. Regan makes it seem like the approximately $20 million he sent to that company was all to benefit investors. But that is not remotely the case. Of that $20 million, approximately $8.5 million went to mining rights and equipment. Investors have not received the proceeds of that investment, and there is no indication that Regan tried to sell the equipment or rights to pay back what he owes. Instead, he just closed up Next Level and Yield in November 2024 and tried to keep the mining investments for himself. Another approximately $6.3 million Regan sent to Grupo Inversur went to an investment in a gym. Again, investors have not seen any profits from that investment, and there is no evidence Regan planned to sell his stake to help cover his losses prior to his arrest. The rest of the Grupo Inversur investments paint an even worse picture for Regan. Most notably, he invested over $2.5 million in a fancy car and property in Colombia. It is hard to see how Regan ever envisioned investors benefiting from those expenditures, and Regan does not appear to have made any efforts to sell those properties to cover investor losses when his fraud collapsed.

The Grupo Inversur money is also only part of what Regan stole. As noted above, Regan received approximately $63 million from investors and has left them with $56 million in lost principal. Approximately $7.8 million went to pay salespeople, but the remainder appears to have gone to whatever other uses Regan saw fit, whether that was covering personal expenses, family expenses, or funding whatever investment opportunity caught his fancy. His investors did not sign up for any of that, and as with the Grupo Inversur investments, Regan has not attempted to use any other investments he may have made to refund his investors. Regan's investments, in other words, do not refute that he ran a Ponzi scheme. Rather, they show that he used victims' money for his own purposes, without any intention of paying them back.

### B. A Sentence of 15 Years Imprisonment is Appropriate Pursuant to the Section 3553(a) Factors.

Taking into account the factors set forth in 18 U.S.C. § 3553(a), the statutory maximum sentence of 15 years' imprisonment—which is also represents the top of the applicable Guidelines Range—is warranted in this case and would be sufficient but not greater than necessary to serve the legitimate goals of sentencing.

#### 1. The Nature, Circumstances, and Seriousness of the Offense

Regan's conduct was cruel, calculated, and grievously harmful, resulting in losses of approximately $56 million to more than 300 victims. That money consists of hard-earned wages that can no longer be put toward a secure retirement, a child's education, treatment for a medical condition, or any other fundamental need. It is money that the victims saved through years—and, in some cases, a lifetime—of hard work from which they will no longer be able to benefit. Over the course of approximately three years, Regan swindled that money out of his victims in a ruthlessly selfish manner that has left a profound trail of destruction in its wake.

Regan's fraud was particularly depraved in three ways. *First*, victims were induced to invest with Next Level and Yield based on promises of the complete safety and security of their investment. Investors in Next Level were promised that they would receive contractually guaranteed double-digit returns with no risk of loss because the note had "full insurance protection." (PSR ¶¶ 11-12.) Indeed, Next Level's marketing materials described the investment as offering noteholders the "ultimate safety and peace of mind" in "uncertain times." (PSR ¶ 12.) Yield was no different. Investors were assured that they would make significant returns with no risk. Yield's marketing materials described the program as offering "unparalleled security for your savings." (PSR ¶ 18.) The victims themselves make clear how important these promises of safety and security were to them in the more than 100 victim impact statements they have submitted, attached hereto as Exhibit A. They emphasize, for example, that "[t]he agent told me there was a safe investment which was secured by an Insurance Bond," that they believed they were making a "safe, protected investment," and that while the "money was great," what "sold [them] was the TWO insurance policies." (Ex. A, at 1, 7, 12.) There is something particularly callous about Regan inducing victims to hand over their life savings by representing that their money would be completely safe all the while knowing that there was nothing safe about the investment and that he planned to use the money as a personal slush fund.

*Second*, the type of investors and funds Regan targeted is particularly reprehensible. The vast majority of the funds invested in the Next Level and Yield products were retirement funds invested through an IRA custodian. The funds that went into Next Level and Yield were savings accumulated over time through years of hard work and that were meant to provide a safe and secure retirement after years of sweat and sacrifice. As one victim writes, "I had saved this money during my tenure at work. . . . . This was all I had to show from my years of working." (Ex. A, at 15.) Another writes that the money he and his father had invested "was money that [they] saved [their] whole lives!" (Ex. A, at 16.) Still another explains: "That money was not extra money or money I could afford to lose. It represented decades of hard work, careful saving, and my hope that I could live independently for the rest of my life without becoming a burden to my family." (Ex. A, at 20.)

That retirement funds were invested in Next Level and Yield was not mere chance. The products were specifically marketed at such savings, with Next Level marketing materials, for example, advertising that the product offered noteholders "ultimate safety and peace of mind for your retirement portfolio." (*See, e.g.*, PSR ¶ 12b.) As a result of this targeting, the consequences on retirees in particular have been devastating. As the daughter of one elderly investor writes: "The forged insurance documents, the guarantees of protection, the promises of high returns with no risk, and the deliberate targeting of everyday people—including elderly investors like my mother—make this more than just financial fraud. It is a crime that has robbed my mother of her safety, her dignity, and the peace of mind she deserved in her final years." (Ex. A, at 8.)

*Third*, the impact of depleting the life savings of more than 300 investors has been predictably catastrophic. This was not money that was stolen from investors with savings diversified across numerous holdings, such that a loss on one investment could be absorbed by the gain on another. Instead, victims have suffered financial ruin including the loss of their homes, their ability to pay for basic needs like medical care, and their capacity to pay even for mundane everyday expenses. One victim writes that the fraud "made [her] homeless." (Ex. A, at 4.) Another writes how every month she is reminded of this fraud when she cannot pay for the prescription

necessary to treat her diabetes (*see* Ex. A, at 2), and another recounts how he can no longer afford his father's Alzheimer's medication as a consequence of this scheme (*see* Ex. A, at 16.) Still another describes in visceral detail the day-to-day impact on his life:

> But because of Paul Regan scamming my nest egg, I am working again. I was counting on the income from that investment to live on. But, since I now live a month to month existence, I can expect to work until the day I die. (And this is very difficult for me since I have had 3 back surgeries, have severe, progressive, peripheral neuropathy and am no longer very steady with my balance at 67 years old due to these conditions.) This experience has effectively ruined my entire life plans. I have had to cancel my gym membership, cable, dental insurance, eye exams, most medical, etc. just to survive and pay my bills. I even had to move to a lousy apartment complex in order to save money that I no longer had. I no longer own a house to live in (for most of my life, I was a proud, American, baby boomer, homeowner for 30 years!.) I am a renter, now, with no expectation of ever being able to buy my own house again. Not the life I had planned and worked so hard for during my prime years.

(Ex. A, at 24.) One elderly couple similarly describes that they are "constantly trying to stretch every dollar to be able to get food and necessities. We can't even afford to host our normal Thanksgiving dinner, and I don't even want to think about Christmas and disappointing our 6 grandchildren. Our entire life has been turned upside down and we are too old and disabled to ever replace that money. If that money is not paid back, we will live the rest of our lives struggling everyday." (Ex. A, at 13.)

These very real and very serious consequences should come as no surprise to the defendant, who was well aware of the harm that would befall his victims. For example, one investor explains that the money invested was to pay for his "wife's serious health condition and battle with Leukemia." Regan <u>personally</u> promised this victim that the victim would receive his $125,000 investment back to pay for chemotherapy and a stem cell transplant. Like all of Regan's promises, that one too was broken, leaving the victim "checking the mail praying our money was there." The ordeal "took years off [the victim's] life." (Ex. A, at 19.)

Moreover, the harm suffered by Regan's investors is not the only harm that resulted from his actions. Rather, Regan's scheme created a cascade of damage felt far beyond those who had entrusted their savings to him. For example, one victim explains that the "consequences of this theft extended well beyond [her] own finances" because she had invested in a business that her daughter managed for years, and when the victim lost her savings, she "was no longer able to meet [her] financial obligations to that business." (Ex. A, at 22.) As a result, the victim's "daughter lost her job, the business lost necessary equipment, and the teachers and staff we employed lost their income." (*Id.*) As a consequence of losing her job, the victim's daughter "lost her home" which the victim's daughter "had purchased for herself and [the victim's] grandson." The victim was additionally left without the ability to contribute toward her grandson's college education. (*Id.*) That is three generations of individuals whose lives have been irreversibly negatively impacted by Regan's scheme. Another victim puts the same concept simply: "[Regan] has made 11 people in

my family suffer financially and the ripple effect has trickled down to my grandkids and had drastic negative effects on their lives and health. Not to mention mine." (Ex A., at 4.)

In addition to the obvious and substantial financial harm resulting from the loss of savings that has befallen Regan's victims, there are other harms that have been equally devastating. Some victims have suffered tax consequences from Regan's scheme. For example, one writes that as a result of the scheme triggering an IRA early withdrawal penalty, "[e]very 90 days or so, the IRS has threatened me with garnishing my wages, causing immense stress related issues on top of my already difficult situation being a quadriplegic . . ." (Ex. A, at 12.) Another writes that she has spent "countless hours dealing with the fallout of this crime—managing legal matters, trying to secure financial assistance and constantly worrying about how we will afford the long-term care [her victim-mother] needs." (Ex. A, at 8.) One couple explains that they are "to the point of considering bankruptcy solely because of one selfish man. Not being dramatic, but he has ruined our lives." (Ex. A, at 13.)

Perhaps most importantly, Regan's scheme has had a profound and lasting impact on the mental health of his victims, who feel saddled with the painful combination of depression and anxiety over the loss of savings and security, combined with embarrassment and shame for having believed Regan and his false promises. As one victim describes, he has "become depressed and [his] anxiety is uncontrollable. [He] go[es] to sleep thinking about it (if [he] can sleep.) [He] wake[s] up thinking about it. [He] feels like [he] can't function some days." (Ex. A, at 13.) Another explains that he is "not the same person since Paul Regan destroyed my life. I don't socialize or have friends anymore because of this truth that is my horrifying secret. I feel broken and ashamed. I don't trust anyone anymore." (Ex. A, at 11.) Another describes feeling utterly worthless: "[My kids] ask me for advice and I can't tell them anything as I feel I have no value." (Ex. A, at 18.) Still another describes the fear that has taken hold of him: "I feel that I'm in a black hole and no one can hear me. I see no light, no resolution. I'm frightened out of my mind." (Ex A, at 15.)

As a result of the financial devastation and emotional anguish they have suffered, several investors have even contemplated suicide. One explains that he has "struggled with feelings of shame, embarrassment, and defeat. At one point, I even considered suicide because I did not know how I would survive without the money I had spent my entire career saving." (Ex. A, at 20.) Another writes about the daily struggle: "This loss put me in a severe depression and I was contemplating suicide. Every night while lying in bed I would plan my suicide. I even mentally wrote several suicide notes." (Ex. A, at 1.)

In sum, Regan's crimes are extraordinarily serious. They have caused financial ruin for hundreds of investors, had reverberating effects that will span generations, and led victims to the depths of despair. Such maximal financial harm, inflicted in a cold and calculated manner on hundreds of victims over the course of years, calls for a maximal sentence—in this case the maximum sentence available under statute: 15 years' imprisonment.

### 2. Regan's History and Characteristics

Regan is an unrepentant, recidivist fraudster whose history and characteristics equally call for a sentence of the maximum available under statute. This case does not represent Regan's first brush with the law, or even his first effort to defraud investors.

Although not a criminal matter, in August of 2004, Regan was barred by the Financial industry Regulatory Authority ("FINRA") from associating with any FINRA/National Association of Securities Dealers member firm in any capacity. (PSR ¶ 86.) FINRA's website does not reveal the reason for the bar, but in 2005 the State of Oregon Department of Consumer and Business Services Division of Finance and Corporate Securities issued a "Final Order to Cease and Desist and Assessing Civil Penalties Entered by Default" against Regan. That Final Order sets forth findings by that agency concluding that Regan engaged in conduct that involved swindling an elderly widow with dementia out of approximately $300,000 of his life savings. (*See* Oregon Division of Financial Regulation Laws and Rules, https://dfr.oregon.gov/AdminOrders/enf-orders2005/S-04-0011-archived.pdf, last visited Nov. 24. 2026)

Less than ten years later, Regan was at it again. This time involved in a fraud remarkably similar to the instant case. (PSR ¶ 55.) Beginning in approximately January 2013, Regan and a co-conspirator knowingly promoted and sold promissory notes to investors nationwide based on material misrepresentations. (PSR ¶ 55.) The investors were led to believe that their investments were secured and were promised 15% returns. Instead of using investor money as represented, however, Regan and his co-conspirator used investor funds for their commissions, personal expenses, and unrelated business expenses. (PSR ¶ 55.) The scheme raised approximately $270,000 from investors. (PSR ¶ 55.)

This case therefore represents at least the third time over the course of approximately twenty years in which Regan has been involved in fraudulent activity. Rather than showing increased maturity and improved behavior as the years have passed, Regan has only escalated his conduct. The 2004 fraud involved only one victim and a few hundred thousand dollars of damage. The 2013 fraud involved more victims, but still only a few hundred thousand dollars of harm. This case now involves more than 300 victims nationwide and approximately $56 million in damages. The only thing Regan has learned from his mistakes apparently is how to increase the scale and scope of the devastation caused by his unlawful conduct.

Such recidivism, demonstrated over the course of more than twenty years, makes clear that fraud is a way of life for Regan. Such conduct calls for a sentence sufficiently substantial to protect the public from the defendant's ever-escalating criminal activity. A sentence at the top of the applicable Guidelines range of 15 years' imprisonment fits that bill.

### 3. Specific and General Deterrence

A lengthy term of incarceration is similarly necessary to deter Regan from committing further crimes. As set forth above, Regan has consistently demonstrated that he is someone who will not be stopped from engaging in widespread fraud that targets even the most vulnerable investors. He was not stopped by a FINRA bar, and he only escalated his wrongdoing after his conviction for the 2013 conduct. A significant term of imprisonment is, therefore necessary both

to deter Regan from ever engaging in conduct like this again, and to incapacitate him from harming the public.

Moreover, a lengthy term of incarceration is necessary to serve the purpose of general deterrence. Without meaningful deterrence, financial crime may be seen as a rational choice. The allure of vast personal wealth is powerful. Further, perpetrators of investment fraud readily convince themselves that it takes just one winning investment to erase financial losses and absolve years of lies and self-dealing. A significant sentence is necessary to deter would-be fraudsters inclined to continue their fraud in the hope of a chance windfall.

General deterrence is particularly vital in cases like this, where the fraud was deliberate, sophisticated, lucrative, and "difficult to detect and punish" since such "attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress".) Regan knowingly and repeatedly chose to deceive investor-victims, for years, while personally enriching himself. Allowing such a brazen fraud to result in anything less than a substantial sentence would send a message to would-be fraudsters that as long as they are willing to accept the trade-off of a few years in jail, fraud does pay. Such a message does a serious disservice to the victims of financial crimes whose lives are left in ruin by the perpetrators of financial crimes.

**4. The Need to Avoid Unwarranted Sentencing Disparities**

Finally, there is strong precedent in this circuit for imposing lengthy sentences on defendants who engage in fraudulent schemes that cause serious and widespread harm. For example, in *United States v. Juan Tacuri*, 22 Cr. 622 (AT), Judge Torres sentenced Tacuri to 240 months' imprisonment—an above Guidelines sentence and the statutory maximum—for engaging in a Ponzi scheme that stole at least $13.9 million from investors. (*See* Tacuri Dkt. 115, at 13.) In imposing the sentence, Judge Torres emphasized the "devastating and incalculable losses" suffered by the victims, many of whom, like Regan's victims, "lost much, if not all, of their life's savings and retirement accounts" and who had endured "immeasurable anguish and suffering." (Tacuri Dkt. 124, at 96.) Similarly, in *United States v. Mattera*, 24 Cr. 117 (LAP), Judge Preska recently imposed a sentence of 108 months' imprisonment, a sentence at the top of the applicable Guidelines range, for a defendant who caused losses of approximately $4.7 million to more than 50 investors. Judge Preska also stated that this term of imprisonment was to run consecutively to the term imposed on the defendant in connection with the defendant's related supervised release proceeding. Sentencing on that violation of supervised release will occur in December before Judge Sullivan. Consistent with those sentences, which recognized the vast and irrecoverable harm suffered by the victims of fraudulent schemes, Regan's conduct calls for a sentence at the statutory maximum and top of the applicable Guidelines range: 15 years' imprisonment.

## Conclusion

For the reasons set forth above, the Government respectfully submits that the Court should impose a within-Guidelines sentence of the statutory maximum of 180 months' imprisonment.[1]

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

by: __/s/______________________
Thomas Burnett
Maggie Lynaugh
Assistant United States Attorneys
(212) 637-2468 / 2448

cc: *Counsel for the defendant* (via ECF)

[1] Several victims have indicated to the Government that they plan to attend sentencing and request the opportunity to speak.